——— FILED      ——— ENTERED
——— LODGED      ——— RECEIVED

SA    JUL 3 0 2003

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                                    DEPUTY

**03-CV-02421-CMP**

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| MANSOUR FADAIE AND LISA GOULD-FADAIE, a martial community,<br><br>Plaintiffs,<br><br>vs.<br><br>ALASKA AIRLINES Inc., an Alaska corporation, and ALASKA AIR GROUP Inc., a Delaware Corp.,<br><br>Defendants. | Case No.:<br><br>**C03-2421L**<br><br>COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF<br>JURY DEMAND |

## I.    Nature of the Action

1.1    This action seeks damages and injunctive relief for wrongful discharge in violation of public policy under Washington common law, retaliation under the Washington Law Against Discrimination (RCW 49.60.180), and religious and national origin discrimination under the Washington Law Against Discrimination (RCW 49.60.180 et. al.).

FADAIE COMPLAINT AND JURY DEMAND - 1

SHERIDAN & BAKER, P.S.
Attorneys at Law
Hoge Building, Suite 1200
705 Second Avenue
Seattle, WA 98104
Tel: 206-381-5949  Fax: 206-447-9206

ORIGINAL

## II.   Jurisdiction and Venue

2.1     This Court has jurisdiction under 28 U.S.C. §1332.  Venue in this Court is proper as to the plaintiffs and all of the defendants under 28 U.S.C. §1391(a).

## III.   Parties

3.1     The Plaintiff, Mansour Fadaie, is a naturalized citizen of the United States residing in Edgewood, WA.  Mr. Fadaie is Moslem and is of Iranian descent.

3.2     The Plaintiff, Lisa Gould-Fadaie, is a citizen of the United States residing in Edgewood, WA.  Ms. Gould-Fadaie is the spouse of Mansour Fadaie.

3.3     Defendant Alaska Airlines, Inc. is, and at all times relevant to this complaint, was a corporation organized and operating under the laws of the State of Alaska, whose principal place of business is in Washington State.  Its principal business, on information and belief, is air transportation.

3.4     Defendant Alaska Group, Inc., is and at all times relevant to this complaint, was a corporation organized and operating under the laws of the State of Delaware, whose principal place of business is in Washington State.  On information and belief, it is a holding company, which owns Alaska Airlines, Inc.  In this complaint, the defendants are jointly and individually referred to as "Alaska Air."

FADAIE COMPLAINT AND JURY DEMAND - 2

SHERIDAN & BAKER, P.S.
Attorneys at Law
Hoge Building, Suite 1200
705 Second Avenue
Seattle, WA  98104
Tel: 206-381-5949  Fax: 206-447-9206

IV. Facts

4.1    Mr. Fadaie was born in Iran in 1952, and came to the United States in late 1977.  Upon his arrival in the United States, Mr. Fadaie attended two years of college at Northeastern A&M, in Miami, majoring in electrical engineering.  After an additional year and a half of study at Oklahoma University, Mr. Fadaie moved to Louisiana and attended Southern University, in Baton Rouge.  He graduated from Southern University in 1982 with a Bachelor of Science degree in electrical engineering.

4.2    In 1983, Mr. Fadaie married Lisa Gould.

4.3    In 1987, Mr. Fadaie became a citizen of the United States.

4.4    In 1990, Mr. Fadaie was hired by Alaska Air as an avionics mechanic and was assigned to work at the Seattle hangar.  Between 1990 and 1997, Mr. Fadaie conducted maintenance on jet aircraft at Alaska Air.  The primary duty of mechanics working at the Seattle facility is airplane maintenance.  Aside from Line Maintenance, mechanics  perform two major types of scheduled maintenance checks, C Check and D Check.

4.5    C Check is generally an annual check.  Production Control and the Planning Department schedule the overhaul work required on specific aircraft. There are many different sub-checks under the heading of C Check.

4.6    D Check is not as frequent as C Check.  Work in this area is generally completed at five-year intervals.  Production Control and Planning coordinate and

FADAIE COMPLAINT AND JURY DEMAND - 3

SHERIDAN & BAKER, P.S.
Attorneys at Law
Hoge Building, Suite 1200
705 Second Avenue
Seattle, WA  98104
Tel: 206-381-5949  Fax: 206-447-9206

schedule the work to be done to each aircraft.  There are different sub-checks under the heading of D Check.

4.7     In 1997, Mr. Fadaie was promoted to supervisor.  Mr. Fadaie was assigned to work in the Base Maintenance/C and D Check department.  His duties included, but were not limited to, the general supervision of aircraft mechanics, including work assignments, training, and evaluation.  Mr. Fadaie was also responsible for planning and subsequent coordination with other Alaska Air departments in the completion of various engineering orders in relation to the work requirements of base maintenance /C Check/D Check.  As a supervisor, Mr. Fadaie often worked eighteen hours per day.  Mr. Fadaie loved his job and frequently came in on weekends even though he was not scheduled to work.

4.8     In or about 1998, while conducting a C Check on a 737-200 at the Seattle hanger, Alaska Air mechanics found cockpit corrosion on a beam under the floor.  The corrosion exceeded FAA or manufacturer safety limits.  Had the plane been allowed to fly, the corrosion on the beam could have jeopardized the safety of the passengers and crew.  The mechanics refused to certify that the plane was in proper repair, and it was grounded.  Alaska Air Director of Base Maintenance, Bob Hinman, yelled at several supervisors saying, "Why did you let them look in that area?  It was not part of this check.  That was for D Check.  You didn't have to look there," or words to that effect.

4.9     In 1998, Alaska Air hired Alan Flowers as Manager of the Component Overhaul Shops.  This department included the Machine, Interior, Fabrication and

FADAIE COMPLAINT AND JURY DEMAND - 4

SHERIDAN & BAKER, P.S.
Attorneys at Law
Hoge Building, Suite 1200
705 Second Avenue
Seattle, WA  98104
Tel: 206-381-5949  Fax: 206-447-9206

Sheet Metal Shop, the Avionics, Battery, Wire Shop and Tool Crib.  Mr. Flowers'

background was in sheet metal and he had no experience in Avionics.  Alaska Air

management had some concerns about the problematic relationship between Mr.

Flowers and the supervisor of the Avionics Shop.  A request was made to Mr. Fadaie

to trade positions with the supervisor.  He agreed and Mr. Flowers became Mr.

Fadaie's immediate supervisor.

      4.10    Under Mr. Flower's supervision, Mr. Fadaie supervised mechanics in

the Avionics Shop.  "Bench work," or the troubleshooting and subsequent "in-house"

repair of electrical components used in Alaska Air's aircraft, was performed in this

work area.  Equipment assigned to the Avionics Shop for repair included "black

boxes," cockpit voice and flight data recorders, and various navigational components.

Mr. Fadaie also supervised the Battery Shop, which charged, repaired and overhauled

the main and emergency batteries for Alaska airplanes.  Additionally, Mr. Fadaie

supervised the Wire Shop.  Work performed there included the rebuilding and repair

of main engine harnesses, pressure switches and igniter leads.  Mr. Fadaie was also in

charge of the system wide Alaska Air tool program.  Aside from supervision of the

employees, he was responsible for the purchase of tools, the annual inventory, and

system-wide tool calibration.

      4.11    Mr. Fadaie also was involved in the hiring process for open positions in

the several work areas he supervised.  In addition, Mr. Fadaie was responsible for

monitoring his departmental budgets, completing expense justifications, as needed,

coordinating work with other departments within the Alaska Air system, including the

FADAIE COMPLAINT AND JURY DEMAND - 5

SHERIDAN & BAKER, P.S.
Attorneys at Law
Hoge Building, Suite 1200
705 Second Avenue
Seattle, WA  98104
Tel: 206-381-5949  Fax: 206-447-9206

monitoring of engineering orders, and maintaining and expanding communication with outside vendors.

4.12    Mr. Flowers gave Mr. Fadaie excellent evaluations in 1999 and 2000.

4.13    In 1999, while Mr. Flowers was visiting Mr. Fadaie's home, he said, "You are one of the good Iranians", with the clear implication that Mr. Flowers did not view other Iranians in a favorable light.

4.14    In 1999, Mr. Fadaie hired an African-American mechanic.  While under probation, this individual had several episodes of tardiness.  Mr. Fadaie discussed the issue with Mr. Flowers.  Mr. Flowers' response was, "Get rid of him." Later that day Mr. Flowers, told Mr. Fadaie, "Now you know not to hire blacks."

4.15    Mr. Fadaie reported Mr. Flowers' discriminatory statements regarding the African American mechanic to Celeste Green, a Human Resources Recruiter at Alaska Air.  As a result of Mr. Fadaie's report,  Alaska Air began an investigation.

4.16    In December 1999 after hearing of Mr. Fadaie's complaint about his supervisor's statement regarding the African-American mechanic, Art Fitzpatrick, the Alaska Air Director of Base Maintenance, visited Mr. Fadaie in his office several times.  Mr. Fitzpatrick used expletives to express his dissatisfaction with Mr. Fadaie's reporting of Mr. Flowers' discriminatory statements to the Human Resources Department.  Mr. Fitzpatrick told Mr. Fadaie, "You have lost every friend you have here by reporting this," or words to that effect.  He also told Mr. Fadaie he "would be fired." In a subsequent conversation with Mr. Fadaie, Mr. Flowers told Mr. Fadaie to change his statement concerning Flowers' remark about not hiring blacks.  Mr.

FADAIE COMPLAINT AND JURY DEMAND - 6

SHERIDAN & BAKER, P.S.
Attorneys at Law
Hoge Building, Suite 1200
705 Second Avenue
Seattle, WA  98104
Tel: 206-381-5949  Fax: 206-447-9206

Flowers told Mr. Fadaie to inform Headquarters that perhaps Mr. Fadaie heard Mr. Flowers incorrectly or said something that Mr. Fadaie did not understand. Mr. Fadaie told Mr. Flowers he could not change the statement, because it was true.

4.17    On January 14, 2000, Mr. Fitzpatrick asked Mr. Fadaie if he could have heard Mr. Flowers' statement incorrectly. Mr. Fitzpatrick continued to inform Mr. Fadaie that his friendships at work were over.

4.18    Mr. Fitzpatrick ultimately completed the investigation into Mr. Flowers' discriminatory statements regarding the African American mechanic. On information and belief, Mr. Flowers received no discipline by Alaska as a result of having made the discriminatory statements.

4.19    On January 31, 2000, Alaska Air flight 261 crashed off the coast of California. On information and belief, the Federal Aviation Administration ("FAA") and the National Transportation Safety Board ("NTSB") began separate investigations to determine the cause of the crash. On information and belief, one or more investigation began to focus on the possibility that a "jackscrew" may have failed, and thereby caused the crash.

4.20    In 2000, the FAA contacted Alaska Air seeking information about the tools used to work on the jackscrew. Some tools used by Alaska Air mechanics were manufactured by an original equipment manufacturer ("OEM") according to the OEM's specifications. Other identical tools used by Alaska Air mechanics were manufactured by Alaska Air employees at Alaska Air facilities ("in house tools"). The FAA directed Alaska Air to ensure that all in house tools used on the jackscrew

FADAIE COMPLAINT AND JURY DEMAND - 7

SHERIDAN & BAKER, P.S.
Attorneys at Law
Hoge Building, Suite 1200
705 Second Avenue
Seattle, WA 98104
Tel: 206-381-5949  Fax: 206-447-9206

and other parts of the airplanes were in conformity with OEM specifications (hereinafter "tool conformity inspection").

4.21    On August 15, 2000, Alaska Air published a revised General Maintenance Manual requiring that in house tools and test equipment be manufactured according to OEM specifications or Alaska Air's engineering specifications and requiring, as a matter of practice, that inspection personnel perform a tool conformity inspection for all tools.

4.22    In August 2000, Mr. Fadaie applied for the position of Manager Tool Control at Alaska Air.  This was a newly created position within the company.  Mr. Fadaie was well qualified for the position, as he had been supervising the tool crib successfully for several years.

4.23    On or about October 4, 2000, Mr. Fadaie met with Alaska Air Vice President of Maintenance and Engineering, Brian Hirshman, and informed him that the tool conformity inspection had not been completed.  In response, Mr. Hirshman said, "It's done."  Mr. Fadaie once again stated, "No sir, it is not done."  To which Mr. Hirshman strongly said, "that is absolutely not true",  and added , "I'm going to talk to Alan [Flowers]."  In fact, as of October 2000, no tool conformity inspection had been completed at either the Oakland or Seattle facilities of Alaska Air.  At the Seattle facility alone, more than 100 tools were never subjected to a tool conformity inspection check and were still in use.

4.24    On or about October 4, 2000, Mr. Fadaie visited the home of Mr. Flowers, who was home with an injury.  During the visit, Mr. Fadaie told Mr. Flowers

FADAIE COMPLAINT AND JURY DEMAND - 8

SHERIDAN & BAKER, P.S.
Attorneys at Law
Hoge Building, Suite 1200
705 Second Avenue
Seattle, WA  98104
Tel: 206-381-5949  Fax: 206-447-9206

again that the tool conformity inspection was not done.  Mr. Fadaie also informed Mr.

Flowers of the conversation earlier in the day with Mr. Hirshman.

4.25    On October 5, 2000, Mr. Fadaie sent an email to Alan Flowers

indicating that the tool conformity inspection still had not been completed.

4.26    On or about October 5, 2000, Alaska Air falsely informed the FAA that

all in house tools had been conformed or quarantined.

4.27    On or about October 6, 2000, Don Cestari, an Alaska Air employee

acting as a liaison with to the FAA informed Mr. Fadaie that he had a letter from

Alaska Air, signed by Mr. Flowers, indicating that the tool conformity inspection had

been completed and that the tools were either conformed or quarantined.  Mr. Fadaie

told Mr. Cestari that the tool conformity inspection was not completed.  In response,

Mr. Cestari responded, "Thank you Manny.  You are an honest man ."  Manny is a

nickname for Mr. Fadaie.

4.28    On information and belief, Alaska Air communicated to the FAA that

the tool conformity inspection had been completed and that the tools were either

conformed or were quarantined.  The representations in the letter were false in whole

or in part.

4.29    On November 6, 2000, Mr. Flowers told Mr. Fadaie, "Brian Hirshman

has it in for you.  He will make you the 'fall guy' for the tool conformity inspection

check.  He will never promote you.  In fact, he will wait until everything is normal.

Six months to a year later when you are feeling good, he will hand you your pink

slip."

FADAIE COMPLAINT AND JURY DEMAND - 9

SHERIDAN & BAKER, P.S.
Attorneys at Law
Hoge Building, Suite 1200
705 Second Avenue
Seattle, WA  98104
Tel: 206-381-5949  Fax: 206-447-9206

4.30    In November 2000, instead of hiring Mr. Fadaie, Jim Dart, a Caucasian native-born American who was substantially less qualified, was hired for the position of Manager Tool Control at Alaska Air.  On information and belief, Mr. Dart is Christian, had not opposed discriminatory practices by Alaska Air, and had not opposed Alaska Air's efforts to disregard FAA safety and maintenance requirements. On information and belief, Mr. Dart had produced tools to use on Alaska Air airplanes that did not conform to specifications required by the FAA, and Alaska was aware of this fact when it promoted him in place of Mr. Fadaie.

4.31    In approximately November 2000, Mr. Flowers provided a supervisor of Alaska Air's Interior Shop with a tool conformity inspection spreadsheet.  Mr. Flowers asked the supervisor to have the Tool Crib Lead Mechanic, George Gwilliam, complete and sign the document indicating that the tool conformity inspection had been done.  The supervisor reported back to Mr. Flowers that Mr. Gwilliam refused to sign the document.  Mr. Flowers then asked that Mr. Fadaie, Mr. Gwilliam's supervisor, demand that the Tool Crib Lead sign the spreadsheet.  Mr. Fadaie was further directed to complete and sign the spreadsheet if Mr. Gwilliam continued to refuse.  Mr. Fadaie asked Mr. Gwilliam what the problem was.  Mr. Gwilliam said something to the effect, "[i]f they want us to do illegal things, just tell me, and I will sign it, but I will report it to HQ."  Mr. Gwilliam informed Mr. Fadaie that he did not even have the tools available to complete the tool conformity inspection check.  Mr. Fadaie reassured Mr. Gwilliam that he did not expect him to sign a document if the job has not been completed.  Mr. Fadaie returned the unsigned document to Mr. Flowers

FADAIE COMPLAINT AND JURY DEMAND - 10

SHERIDAN & BAKER, P.S.
Attorneys at Law
Hoge Building, Suite 1200
705 Second Avenue
Seattle, WA  98104
Tel: 206-381-5949  Fax: 206-447-9206

and told him that he should refer to the General Maintenance Manual where it clearly states tools must be on hand for inspection. At a subsequent meeting, in response to Mr. Fadaie's actions, Mr. Flowers accused Mr. Fadaie of "not being a fucking team player." Art Fitzpatrick, Director of Base Maintenance, and Jim Dart, another supervisor, arrived at Mr. Flower's office later. Mr. Fadaie was sent home. As Mr. Fadaie was leaving, Mr. Fitzpatrick stated, "You give a fucking guy a chance and he drags you down."

4.32    In a letter dated, December 3, 2000, Mr. Fadaie again told Mr. Hirshman that the tool conformity inspection had not been completed.

4.33    On information and belief, on or about December 5, 2000, Mr. Hirshman directed Alaska Air mechanics to use a quarantined tool in the completion of an aircraft repair, after he was expressly advised the tool was quarantined because it was not conformed. Upon hearing that the "quarantined tools" were being used, Mr. Fadaie told the engineering department that those tools cannot be used. On information and belief, a quarantined tool was used. Upon hearing that the tool was being used, Mr. Fadaie told the engineering department to stop using quarantined tools.

4.34    On information and belief, Mr. Hirshman took no action to correct the false document or to notify the FAA that the tool conformity inspection had not been completed.

4.35    At a Christmas party in December 2000, Mr. Fadaie had a conversation with John Kelly, then CEO of Alaska Air. Several issues were discussed, including

FADAIE COMPLAINT AND JURY DEMAND - 11

SHERIDAN & BAKER, P.S.
Attorneys at Law
Hoge Building, Suite 1200
705 Second Avenue
Seattle, WA 98104
Tel: 206-381-5949  Fax: 206-447-9206

that the tool conformity inspection was not complete, and that management was pressuring Mr. Fadaie to agree that it was complete.  In this discussion Mr. Fadaie also raised his concern for Alaska Air's practice of placing non-technical managers, such as Sheet Metal or Interior personnel, in charge of technical departments, such as the Avionics Shop.  These individuals had little or no knowledge of the areas they were required to supervise.  The engineering department was also discussed.  Mr. Fadaie reported to Mr. Kelly that he believed that the lack of work force in the engineering department at Alaska was resulting in the needs of the Avionics Shop being ignored.  Mr. Fadaie also complained about his failure to be promoted to the Tool Control Manager position, his conflicts with Mr. Flowers and Mr. Flowers' improper admonition not to hire blacks.  Mr. Kelly responded that he would look into Mr. Fadaie's concerns.  He said, " Give me two weeks and I'll take care of it."

4.36    In approximately January 2001, during a meeting with Mr. Fadaie and the Avionics Shop mechanics, Mr. Flowers congratulated staff that the Avionics Shop tool conformity inspection had been completed in such a short time: November 9th to November 16th, 2000.  After the gathering, Mr. Fadaie told Mr. Flowers that was not correct, and that the Avionics Shop tool conformity inspection was not done.

4.37    On January 5, 2001, Mr. Fadaie met with Alaska Air managers, including Brian Hirshman, Mickey Cohen, Senior Vice President of Maintenance and Engineering and Dave Prewitt, Vice President of Safety.  They asked Mr. Fadaie what he had told John Kelly in the December conversation.  Mr. Fadaie reiterated that the tool conformity inspection was not done, summarized concerns regarding Mr.

FADAIE COMPLAINT AND JURY DEMAND - 12

SHERIDAN & BAKER, P.S.
Attorneys at Law
Hoge Building, Suite 1200
705 Second Avenue
Seattle, WA  98104
Tel: 206-381-5949  Fax: 206-447-9206

Flowers, apprised them of practices in the engineering department at Alaska Air that threatened the safety of Alaska Air flights, and discussed his knowledge of racial discrimination at Alaska Air.

4.38    In January 2001, at a Leadership Conference of management personnel, Mickey Cohen spoke before the large group.  Towards the beginning of his presentation, he brought up the issue of management personnel "back stabbing" other management personnel.  He was referring to employees who complained to Headquarters about other employees.  This statement was relayed to the mechanics "on the hanger floor."  Several mechanics and management personnel asked Mr. Fadaie whether he was the "back stabber" Mr. Cohen had alluded to.

4.39    On information and belief, in January 2001 several mechanics wrote to Alaska Vice President, Bill Ayers to express their concern that Mr. Cohen wished them to refrain from reporting problems to Headquarters, even if the supervisors were failing to address such problems.

4.40    On January 18, 2001, Mr. Fadaie wrote to Martin Knox,  Acting Manager, Avionics and Support Shops, indicating that the tool conformity inspection was not completed.

4.41    In March 2001, Thom Deason was hired and took over the management position of Alan Flowers.  Mr. Deason had no prior avionics experience.  Mr. Deason regularly attempted to convert Mr. Fadaie to Christianity.  Mr. Fadaie refused to convert.

FADAIE COMPLAINT AND JURY DEMAND - 13

SHERIDAN & BAKER, P.S.
Attorneys at Law
Hoge Building, Suite 1200
705 Second Avenue
Seattle, WA  98104
Tel: 206-381-5949  Fax: 206-447-9206

4.42   In March 2001, Mr. Fadaie explained the tool conformity inspection issue to Mr. Deason.  Mr. Deason told Mr. Fadaie that the tool conformity inspection issue would be taken care of later.

4.43   On May 3, 2001, apparently believing Mr. Fadaie had repeated Mr. Cohen's "back stabbing" statement noted in paragraph 4.38 to the mechanics, Mr. Cohen confronted Mr. Fadaie near the engineering department.  He angrily told Mr. Fadaie that he had "loose lips."  In fact, Mr. Fadaie had not repeated the statement.  Mr. Fadaie scheduled an appointment with Mr. Cohen to discuss this issue further as well as to open up the dialogue regarding tool conformity inspection, engineering, advancement of the Avionics Shop and the loss of the Tool Control Management position.  At this meeting Mr. Cohen asked Mr. Fadaie if he had received any training via the Company contracted management courses.  Mr. Fadaie responded, "No", to which Mr. Cohen told him that he would arrange, through Mr. Hirshman, for Mr. Fadaie to receive this training.  Mr. Fadaie never heard anything about this topic again, nor was any management training offered to him.

4.44   In May 2001, Gus Merizalde, Managing Director of Powerplants, Shops and Tooling, told Mr. Fadaie that Mickey Cohen requested that he talk to him.  At a meeting, Mr. Fadaie discussed with Mr. Merizalde many of the same issues he had reviewed with Mr. Cohen in their meeting of May 4, 2001.

4.45   On October 22, 2001, and several times thereafter, Mr. Fadaie reported to Mr. Merizalde and to Mr. Deason that the flight data recorders from the airplanes being serviced were not being read in accordance with federal regulations.  The

FADAIE COMPLAINT AND JURY DEMAND - 14

SHERIDAN & BAKER, P.S.
Attorneys at Law
Hoge Building, Suite 1200
705 Second Avenue
Seattle, WA 98104
Tel: 206-381-5949 Fax: 206-447-9206

applicable regulations required that the information be maintained (and therefore read) within sixty days of downloading the data.  Instead, reading the recorders from Alaska Air aircraft was taking up to fourteen months.  This lack of timely oversight undermined the efficacy of maintenance and therefore of air safety at Alaska Air.  Mr. Fadaie informed management that software needed to be written and purchased in order to read the flight data recorders in-house, and that he had obtained several price quotes for such software.  However, his request to purchase the software was ignored, thereby permitting continued violations of federal regulations and Alaska Air rules.  When Mr. Fadaie complained further, he was told by Mr. Deason to stay in "his box."  Mr. Fadaie responded that the violations affected his department, affected "his box," or words to that effect.  Alaska Air eventually purchased the software from a vendor with whom Mr. Fadaie had established contact, shortly after Mr. Fadaie was demoted to the position of mechanic.

4.46    On or about November 2, 2001 Mr. Fadaie stopped the installation of a wingtip on an Alaska aircraft.  There was no paperwork attached to the wingtip indicating what type of repair had been completed, as required by Alaska Air policies and FAA regulations.  The part number and serial number assigned to the part indicated that it was already in place on a different aircraft.  Mr. Fadaie refused to allow the wingtip to be used.  In fact, he quarantined the item until the conflicting information attached to the wingtip was resolved and the missing paperwork was located.  Mr. Deason was angry with Mr. Fadaie and his decision, because it resulted in a delay.

FADAIE COMPLAINT AND JURY DEMAND - 15

SHERIDAN & BAKER, P.S.
Attorneys at Law
Hoge Building, Suite 1200
705 Second Avenue
Seattle, WA 98104
Tel: 206-381-5949  Fax: 206-447-9206

4.47    In early 2002, Mr. Deason gave Mr. Fadaie a Christian Bible written in Farsi.  Mr. Fadaie accepted the gift, but told Mr. Deason that he would not convert to Christianity.  Subsequent to that statement, Mr. Deason began to treat Mr. Fadaie in an unfriendly and critical manner.

4.48    In an email dated February 2002 Mr. Fadaie notified Mr. Merizalde and Mr. Deason of a continuing failure of the Engineering Department to correctly process the Manufacturer Service Bulletins.  This failure caused inconsistencies between vendor standards and the standards under which in-house repairs were performed, and therefore to poor maintenance and potentially unsafe equipment on the aircraft.  It also caused delays in repairs, since mechanics were forced to locate and notify Engineering of pertinent Service Bulletins rather than the other way around.  Mr. Fadaie and the Avionics Shop mechanics had been complaining about this problem for years.  Mr. Deason's response was, "I have said (so has Gus) that we cannot undo 75 years of system problems in a few months, and it could take years."  Mr. Deason also wrote to Mr. Fadaie that "Remember that you also need to stay inside your boundaries as a supervisor."  Mr. Fadaie was frequently told by Mr. Deason and Mr. Merizalde that he "needed to stay inside his box" on a variety of issues, meaning Me. Fadaie was to stop complaining about safety issues.

4.49    In April 2002, Mr. Fadaie was put on probation, which is a form of progressive discipline.  Gus Merizalde and Thom Deason informed Mr. Fadaie that he was not meeting the expectations of his position.  Mr. Fadaie was also given a

SHERIDAN & BAKER, P.S.
Attorneys at Law
Hoge Building, Suite 1200
705 Second Avenue
Seattle, WA  98104
Tel: 206-381-5949  Fax: 206-447-9206

corrective action letter.  Thom Deason played a principal role in the decision and authored the corrective action letter.

4.50    Repair work in the shops supervised by Mr. Fadaie required specific tooling identified in the *Component Maintenance Manual*.  It was incumbent upon Mr. Fadaie to see that those tool needs were met.  There were many instances when Mr. Fadaie would complete a purchase requisition for tools, forward it on to Mr. Deason, who then would fail to make the purchase.  While Mr. Fadaie was "under the corrective performance plan," this situation occurred so frequently that his mechanics made a point of telling Mr. Fadaie that he "was being set up to fail."  On one occasion, during a meeting attended by Mr. Fadaie, Mr. Deason, Mr. Merizalde, Mr. Dart and Mr. Gwilliam, Mr. Merizalde became angry about the absence of a part and complained to Mr. Fadaie that he was doing Mr. Fadaie's job.  In fact, Mr. Fadaie had completed the order for the part some 8 months earlier, but Mr. Deason had failed to process the order.  As Mr. Fadaie attempted to tell Mr. Merizalde that Mr. Deason was given the paperwork long ago, Mr. Deason interrupted the conversation and stated, "This is not the time to discuss it."

4.51    In July 2002, Mr. Deason informed Mr. Fadaie that he was not meeting the job expectations as set forth in the performance plan.  Mr. Deason told Mr. Fadaie to "go back to the floor" so Alaska Air could "fill your space."  Mr. Fadiae was demoted to the position of mechanic, which is covered by a collective bargaining agreement.

FADAIE COMPLAINT AND JURY DEMAND - 17

SHERIDAN & BAKER, P.S.
Attorneys at Law
Hoge Building, Suite 1200
705 Second Avenue
Seattle, WA  98104
Tel: 206-381-5949  Fax: 206-447-9206

4.52    Alaska Air has falsely claimed that Mr. Fadaie's performance as a supervisor was inadequate, and that the Avionics and Wire shops, which he supervised, had difficulties with production controls and in establishing metrics and measures.

4.53    In July 2002, Mr. Fadaie's union grieved the demotion contending that a supervisor could not be sent back to a union position unless there was a true reduction in workforce.  At the time of the demotion, Alaska Air was aware that demoting Mr. Fadaie in circumstances that were unrelated to a workforce reduction would result in the union filing a grievance.  Alaska Air initially rejected the union grievance and Mr. Fadaie remained a mechanic.

4.54    In October 2002, Mr. Fadaie filed an administrative complaint with OSHA alleging he was being punished for disclosing improper conduct by Alaska Air.

4.55    On or about October 10, 2002, Mr. Fadaie reported the improper actions of his managers to the Washington DC office of the FAA.  Upon investigation, Dean Hamilton,  and other local FAA  investigators, told Mr. Fadaie, "You are right. They [Alaska Air] falsified information."

4.56    In January 2003, the FAA reported that it had found Alaska Air in violation of at least one FAA "order, regulation or standard relating to air carrier safety," based on information Mr. Fadaie had provided about Alaska Air to the FAA.

4.57    As a result of Mr. Fadaie's October 2002 complaint to the FAA, the Avionics Shop was closed down for a complete tool conformity inspection check in early 2003.  Mr. Fadaie, along with other avionics mechanics, was involved in tool

FADAIE COMPLAINT AND JURY DEMAND - 18

SHERIDAN & BAKER, P.S.
Attorneys at Law
Hoge Building, Suite 1200
705 Second Avenue
Seattle, WA  98104
Tel: 206-381-5949  Fax: 206-447-9206

conformity inspection checking of all in-house made equipment and test panels. A test panel is an electrical panel used to test equipment. Test panels were also subject to tool conformity inspection. Mr. Fadaie became aware that six or seven non-conforming oven test panels were being put into service and certified as having been through the tool conformity inspection even though they had not been conformed. Mr. Fadaie advised Supervisor Robert Creamer and Mr. Deason that the use of the panels was improper and that the tool conformity inspection paperwork had been completed improperly.

4.58    On February 12, 2003, Mr. Fadaie put together a list of tools that still needed to be conformed in the shop. The lengthy list was forwarded to Bob Creamer, the new Avionics Shop Supervisor and Thom Deason. The following day, Mr. Merizalde removed Mr. Fadaie from any active part in the tool conformity inspection check. Mr. Fadaie was told not to talk to the mechanics or give them any direction regarding tool conformity inspection. Mr. Fadaie was also told not to provide any documentation to the mechanics who were working on the tool conformity inspection.

4.59    On February 13, 2003, Mr. Fadaie informed Dean Hamilton, the FAA investigator, that non-conformed test panels were being placed in service and certified as conformed.

4.60    In March 2003, OSHA found that Mr. Fadaie had made disclosures to the FAA concerning safety violations by Alaska Air. OSHA also found that the justification Alaska Air provided to OSHA for demoting Mr. Fadaie was incredible. However, OSHA found insufficient evidence to support Mr. Fadaie's administrative

FADAIE COMPLAINT AND JURY DEMAND - 19

SHERIDAN & BAKER, P.S.
Attorneys at Law
Hoge Building, Suite 1200
705 Second Avenue
Seattle, WA 98104
Tel: 206-381-5949 Fax: 206-447-9206

complaint of retaliation, because some other Alaska Air employees who made such disclosures were not demoted.

4.61    In April 2003, Mr. Fadaie met with Scott Lautman, Manager of Employee Relations, at which time Mr. Fadaie was asked if he was going to appeal the OSHA finding.  Mr. Fadaie told Mr. Lautman that he would not appeal.

4.62    In May 2003, Alaska Air promoted Mr. Fadaie back to the position of supervisor by approving the union grievance, and then promptly terminated Mr. Fadaie.

4.63    The intentional actions of Alaska Air caused Mr. Fadaie severe emotional distress.

4.64    Alaska Air is liable for the actions of its employees and agents under the doctrine of respondeat superior.

### V.    First Cause Of Action For Wrongful Discharge

5.1    Plaintiffs reallege paragraphs one through four, inclusive, of the complaint, and hereby incorporate the same by reference.

5.2    The facts set forth above state a claim against Alaska Air for wrongful discharge in violation of state and federal public policies of promoting worker safety, protecting public safety, of prohibiting false statements to government agencies or investigators, and protecting those who report violations of these policies.

### VI.    Second Cause of Action for Retaliation

6.1    Plaintiffs reallege paragraphs one through four, inclusive, of the complaint, and hereby incorporate the same by reference.

FADAIE COMPLAINT AND JURY DEMAND - 20

SHERIDAN & BAKER, P.S.
Attorneys at Law
Hoge Building, Suite 1200
705 Second Avenue
Seattle, WA  98104
Tel: 206-381-5949  Fax: 206-447-9206

6.2     The facts set forth above state a claim against Alaska Air for a continuing violation of the Washington Law Against Discrimination (RCW 49.60.180, et. seq.) for intentional retaliation against Mr. Fadaie for reporting one or more violations of this statute.

VIII.   Third Cause of Action for Religious/ National Origin Discrimination

8.1     Plaintiffs reallege paragraphs one through four, inclusive, of the complaint, and hereby incorporate the same by reference.

8.2     The facts set forth above state a claim against Alaska Air for a continuing violation of the Washington Law Against Discrimination (RCW 49.60.180, et. seq.) for intentional religious and/or national origin discrimination against Mr. Fadaie.

IX.     Fourth Cause Of Action For Outrage

9.1     Plaintiffs reallege paragraphs one through four, inclusive, of the complaint, and hereby incorporate the same by reference.

9.2     The facts set forth above state a claim against Alaska Air for outrage.

X.      Fifth Cause Of Action For Negligent Infliction of Emotional Distress

10.1    Plaintiffs reallege paragraphs one through four, inclusive, of the complaint, and hereby incorporate the same by reference.

10.2    The facts set forth above state a claim against Alaska Air for negligent infliction of emotional distress.

FADAIE COMPLAINT AND JURY DEMAND - 21

SHERIDAN & BAKER, P.S.
Attorneys at Law
Hoge Building, Suite 1200
705 Second Avenue
Seattle, WA 98104
Tel: 206-381-5949  Fax: 206-447-9206

XII.   Prayer For Relief

WHEREFORE, plaintiffs pray for relief as follows:

11.1   Damages for back pay, front pay, lost benefits, and medical expenses in excess of $75,000;

11.2   Damages for loss of enjoyment of life, pain and suffering, mental anguish, emotional distress, injury to reputation, and humiliation in excess of $75,000;

11.3   Prejudgment interest in an amount to be proved at trial;

11.5   Reasonable attorney's fees and costs;

11.6   The income tax that must be paid on the aggregate of the above compensation in an amount to be proven after trial;

11.6   Injunctive relief;

11.7   Whatever further and additional relief the court shall deem just and equitable.

V.   DEMAND FOR JURY

5.1   Plaintiffs hereby demand that this case be tried before a jury.

Dated this 30th day of July, 2003.

Sheridan & Baker, P.S.

By: _____
     John P. Sheridan, WSBA # 21473
     Randy Baker, WSBA #27421
     Attorneys for Plaintiff

FADAIE COMPLAINT AND JURY DEMAND - 22

SHERIDAN & BAKER, P.S.
Attorneys at Law
Hoge Building, Suite 1200
705 Second Avenue
Seattle, WA  98104
Tel: 206-381-5949  Fax: 206-447-9206